**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**ASOCIACION DE LABORATORIOS CLINICOS, INC.**, *et al.*,

Plaintiffs,

v.

**MEDICAL CARD SYSTEM, INC.**, *et al.*,

Defendants.

Civil No. 15-1099 (GAG/BJM)

**REPORT AND RECOMMENDATION**

Asociacion de Laboratorios Clinicos Inc. ("ALC") and several clinical laboratories (the "labs") bring this suit against Medical Card System Inc. ("MCS") and MCS Advantage Inc. ("Advantage") for false advertising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for breach of contract and tortious interference under state law. 2d Am. Compl., Docket No. 57. Plaintiffs' claims arise from contracts between the labs and MCS. They allege that defendants breached or interfered with the contracts and subsequently disseminated false statements about the relevant contractual relationships. *Id.* Defendants moved to dismiss for failure to state a claim. Docket No. 59.[1] Plaintiffs opposed, defendants replied, and plaintiffs surreplied. Docket Nos. 70, 79 ("Reply"), 87. The matter was referred to me for a report and recommendation. Docket No. 66. For the reasons below, the motion should be **granted**.

**STANDARD OF REVIEW**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). The court parses the allegations of the complaint in two steps. First, "'legal conclusion[s] couched as . . . fact[]' or '[t]hreadbare recitals of the elements of a cause of action'" are identified and

[1] The motion incorporates in full the arguments made in a previous motion to dismiss the first amended complaint. *See* Docket No. 44 ("Mot.").

completely disregarded. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (alterations in original). The remaining "[n]on-conclusory factual allegations" are then "treated as true, even if seemingly incredible." *Id.* The complaint is sufficient only if those well-pleaded facts "state a plausible, not a merely conceivable, case for relief"; however, the court must not "attempt to forecast a plaintiff's likelihood of success on the merits." *Id.* at 12–13.

Generally, review is limited to the face of the complaint, and if the court considers matters outside the pleadings, it must give notice to the parties and convert the motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d). But where the complaint's allegations "are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998). And no conversion need occur when the court "chooses to ignore the supplementary materials" provided by the parties. *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 18 (1st Cir. 1992).

**BACKGROUND**

ALC is a non-profit Puerto Rico organization that represents 185 clinical laboratories in Puerto Rico. 2d Am. Compl. ¶ 2. Its general purpose is to ensure, by protecting clinical laboratories from economic and operational threats, that Puerto Rico citizens enjoy access to adequate healthcare services. *Id.* The labs are individual clinical laboratories authorized to do business in Puerto Rico, *id.* ¶ 1; presumably, they are among those represented by ALC. Both MCS and Advantage are Puerto Rico corporations. *Id.* ¶¶ 4, 6. MCS sells and operates health plans, including Medicare Advantage plans—managed care plans for Medicare beneficiaries. *Id.* ¶ 3. Health care providers, including physicians and, as here, clinical laboratories, contract with MCS in order to serve as participating providers in MCS's plans. *Id.*

The labs each separately contracted with MCS in what was termed a Preferred

Provider Organization ("PPO") Agreement. *Id.* ¶ 8; Docket No. 15-1.[2] Under this contract, the labs agreed to provide services for those insured under both the private and Medicare Advantage plans offered by MCS and its affiliate entities. 2d Am. Compl. ¶¶ 9–14. The one contract, that is, established the labs as covered providers in two separate MCS networks: the PPO Network, consisting of private medical plans, and the Medicare Advantage Network. *Id.* ¶¶ 14–16. It was the only contract with MCS entered into by the labs; it specifically provides that it constitutes the "complete and sole agreement" between the parties. *Id.* ¶¶ 18, 21; Docket No. 15-1, at 20. Advantage was not a party to the PPO Agreement. 2d Am. Compl. ¶ 19.

The contract permits termination without cause by either party upon 60 days' written notice, delivered either personally or, if written confirmation of delivery is available, by certified or registered mail. *Id.* ¶¶ 22, 43; Docket No. 15-1 ¶¶ 10.9, 12.2. Federal regulations require the same amount of notice. 2d Am. Compl. ¶ 54. The contract does not contain a partial termination clause. *Id.* ¶¶ 23, 58; *see* Docket No. 15-1.

In 2014, Advantage sent letters to the labs separately informing them that it was terminating the "MCS Advantage Clinical Laboratory Provider Agreement," without cause, effective as of a specific date that varied lab to lab. 2d Am. Compl. ¶ 27. The labs had not signed any contract by that name. *Id.* ¶¶ 28, 31, 55. Several of these letters were not delivered in person or by certified or registered mail. *Id.* ¶ 42. Several other letters set forth an effective termination date fewer than 60 days from the time of delivery. *Id.* ¶¶ 43–53. Most labs appealed the termination, without success. *Id.* ¶ 30.

Advantage then sent letters to insureds under an MCS Medicare Advantage plan

---

[2] Plaintiffs attached a copy of a PPO Agreement between MCS and an single clinical laboratory to the memorandum in support of their motion for a preliminary injunction. Docket No. 15-1. They refer to this document in their opposition. Defendants do not challenge the document's authenticity, and I consider it merged with the pleadings. Because plaintiffs allege that each lab signed an essentially identical contract with MCS, 2d Am. Compl. ¶ 8 n.2, I assume for present purposes that the terms of this exemplar PPO Agreement are representative in all essential respects of the terms of the labs' individual contracts.

stating that the labs were no longer part of MCS's Medicare Advantage Network. *Id.* ¶ 33; Docket No. 24-2.[3] The subject line of the letters was "Notification to select a new provider." 2d Am. Compl. ¶ 34; Docket No 24-2. The letter read, in relevant part:

> Kindest regards from the MCS Classicare family.
>
> Our records indicate that you have received services from [particular lab]. We wish to inform you that after [date] this provider will not be part of the MCS Classicare provider network.
>
> You have the right to remain with your current provider for a transition period of ninety (90) days . . . . After finishing this transition period, if you continue receiving services from this non-contracted provider, you may be responsible for paying those services.

Docket No. 24-2. Also, MCS removed the labs from an online directory of providers in its Medicare Advantage Network. 2d Am. Compl. ¶ 35.

Advantage's announcement that the labs are no longer participating providers in the Medicare Advantage Network has significantly affected the labs' business and the lives of their longstanding elderly and disabled patients. *Id.* ¶ 36. The relationships between clinical laboratories and their patients are personal and emotional. *Id.* ¶ 37. Individuals often select a particular health insurance plan because the providers they trust are "in network." *Id.* When alerted that their preferred laboratory was no longer part of the Medicare Advantage Network, the labs' patients were effectively forced to seek services elsewhere in order to avoid incurring significant out-of-pocket expenses. *Id.* ¶¶ 36–37.

Patients have informed the labs that they have ceased using the labs' services because of the letters they received and because defendants do not allow them to do so. *Id.* ¶ 38.

---

[3] Both parties refer in their papers to a July 1, 2014, letter, sent to a particular insured regarding a particular lab, which plaintiffs submitted in support of their motion for a preliminary injunction. Docket Nos. 15-3, 24-2 (certified English translation). I consider this letter merged with the pleadings and assume it to be representative of all the letters allegedly sent to insureds.

The letters were on the letterhead of MCS Classicare, which plaintiffs allege is a product sold by Advantage. 2d Am. Compl. ¶ 33 & n.5; Docket No. 24-2. The letters refer to the relevant network as the "MCS Classicare provider network." Docket No. 24-2. This is apparently the technical name of the Medicare Advantage network the labs entered into, along with MCS's PPO Network, under the PPO Agreement. *See* Docket No. 15-1, at 20.

Some patients have signed letters requesting that MCS allow the labs to continue providing services as part of the Medicare Advantage Network. *Id.* ¶ 39.

Insureds use the provider directory published by MCS to verify whether they can use the services of particular health care providers. *Id.* ¶ 60. The directory is also used by the plan's customer support center, which informs insureds of the providers available under the plan. *Id.* ¶ 61. When a provider is not included in the directory, insureds are told to visit a different provider. *Id.* Defendants' employees have informed the labs' patients that they may not use the labs' services because they are not included in the provider directory. *Id.* Generally, insureds do not visit providers omitted from the directory. *Id.* ¶ 63.

The labs are still performing services to insureds under the PPO Network. *Id.* ¶ 40. But they have suffered economic and reputational losses stemming from the loss of business from patients enrolled in a Medicare Advantage plan. *Id.* ¶¶ 75, 78, 80.

## DISCUSSION

Plaintiffs raise three interrelated claims. As they tell it, the letters sent to patients and the online provider directory contained a false statement: that the labs were not part of the Medicare Advantage Network. The labs, they say, were and still are in that network. Though defendants attempted to terminate them from the Medicare Advantage Network (and not from the PPO Network), the termination was, for various reasons, legally ineffective. First, they say, the notice Advantage sent the labs purported to terminate a nonexistent contract, the MCS Advantage Clinical Laboratory Provider Agreement; the only contract the labs signed was the PPO Agreement, which placed them in both MCS's Medicare Advantage and PPO Networks. Advantage apparently intended to remove the labs from the Medicare Advantage Network, but it did not refer to the proper instrument or even, according to plaintiffs, one the labs had signed. Second, the PPO Agreement could not be partially terminated, and thus Advantage's attempt to remove the labs from only one of the two contracted-for networks was impermissible. Third, Advantage was not even a party to the PPO Agreement and so lacked authority to effect its termination, partial or complete. Finally,

the notice received by at least some of the labs was deficient under the contract, either because it was not delivered in an acceptable manner or because it set an effective termination date fewer than 60 days from receipt.

Plaintiffs claim that, because of these several problems, their participation in the Medicare Advantage Network under the PPO Agreement was never effectively terminated, and they remain legally in-network to this day. It follows that defendants' representations to the contrary were untrue, and plaintiffs view those them as actionable false advertising under the Lanham Act. The ineffective attempt at termination also constituted a breach of contract, plaintiffs say, and Advantage's conduct constituted tortious interference with a contract to which it is not a party.

Defendants move for dismissal on several grounds. They argue, as an initial matter, that ALC lacks Article III standing. They then present a host of reasons why plaintiffs have failed to state a cognizable claim under the Lanham Act; and without a valid Lanham Act claim, defendants urge, plaintiffs' state-law claims should be dismissed. Defendants' standing argument and most of their arguments as to the Lanham Act claim's insufficiency are without merit or incomplete. I am persuaded, however, by one: the challenged representations were not promotional—there was no advertising on which to premise a false advertising claim. For the sake of completeness, I begin with a discussion of the arguments which fail to persuade.

## I. ALC's Standing

The doctrine of standing's "core component" is derived from Article III of the Constitution, which defines the power of federal courts as extending to "Cases" and "Controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff must demonstrate an interest in the proceedings sufficient to create a justiciable case or controversy. Such an interest exists if the plaintiff suffered an injury in fact, the injury and the conduct complained of are causally connected, and it is likely that a favorable decision by the court would provide redress. *Id.* at 560–61.

Things are slightly complicated when it comes to plaintiff associations. An association may, in some circumstances, "have standing in its own right to seek judicial relief from injury to itself," and in such a case the inquiry is straightforward. *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 44 n.7 (1st Cir. 2012) ("It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members."). But an association may also "have standing solely as the representative of its members even in the absence of injury to itself." *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 10 (1st Cir. 1986) (citing *Warth*, 422 U.S. at 511). Where an association seeks redress for its members' injuries, rather than its own, it has standing if: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purposes; and (3) neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit." *Id.* (citing *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

The whole of defendants' argument is that plaintiffs have failed to plead any cognizable injury to ALC's own interests. That much is true: the complaint does not specifically allege an injury to ALC, and its well-pleaded facts do not together permit such an inference. ALC therefore lacks standing to litigate on its own accord. But it might yet have standing in a representative capacity, and defendants fail to make any argument as to that possibility. They do not acknowledge even the potential of representative standing or argue that the labs themselves lack Article III standing. Plaintiffs do not address the issue of standing at all in their opposition. Without the benefit of briefing on the subject, I decline to determine whether ALC has standing to sue on its members' behalf.

## II. False Advertising

Section 43(a) of the Lanham Act imposes liability on "[a]ny person who uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the

nature, characteristics, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). To prevail on a claim of false advertising under the Act, a plaintiff must show that

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product [service, or commercial activities]; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310–11 (1st Cir. 2002).

Defendants start with a broad argument that plaintiffs are impermissibly trying to make a federal case out of a contract dispute. They would have the court dismiss the Lanham Act claims as an ungainly attempt to finagle federal resolution of an inherently local dispute. Barring that, they argue, the complaint is deficient with respect to both aspects of a false advertising claim's first essential element. Plaintiffs' allegations reveal that the representations they challenge were neither false nor misleading; what is more, plaintiffs fail to plausibly state that either representation constituted a "commercial advertisement."

### A. Contract Issues

Defendants contend that plaintiffs' false advertising claims should be dismissed because they depend entirely on disputed matters of contract law. At the claims' heart is the assertion that defendants' purported termination of the labs' contracts was ineffective; only if that is in fact so were defendants' representations to the contrary false or misleading under the Lanham Act. But this, defendants urge, "is a controversy that needs to be decided by a court with [original] subject matter jurisdiction over" the underlying contractual dispute—not this court, given the parties' nondiversity. Mot. 19.

It is true that whether defendants' communications were false depends on whether the

labs' contracts were terminated as a matter of law. But defendants do not explain why that fact, in itself, compels dismissal. They provide no authority for the proposition that a § 43(a) false advertising claim cannot lie when its resolution would require the court to interpret a contract, or for the narrower proposition that a false statement about the terms or existence of a contractual relationship cannot support a claim under § 43(a). The Act itself contains no such express limitations, and the two cases on which defendants rely are inapposite.

In the first, *Silverstar Enterprises, Inc. v. Aday*, 537 F. Supp. 236 (S.D.N.Y. 1982), the exclusive licensee of a trademark sued the registrant-licensor, which had entered into a license agreement with a third party, for both infringement and false advertising. The court dismissed both claims, the latter because the plaintiff did not allege that any consumer confusion would result from a second licensor's sale of products bearing the relevant mark. *Id.* at 241. The court then noted:

> [T]his case is essentially a contract dispute between an exclusive licensee and a licensor over the right to use the trademark . . . . Silverstar's dispute should be determined by the principles of contract law, as it is the contract that defines the parties' relationship and provides mechanisms to redress alleged breaches thereto. The Lanham Act, in contrast, establishes marketplace rules governing the conduct of parties not otherwise limited. This court, however, does not have jurisdiction over such a contract dispute without diversity of citizenship.

*Id.* at 242.

These statements were, first of all, dicta; the court had already determined that the plaintiff failed to state a claim for false advertising. *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992) (defining dicta as "observations relevant, but not essential, to the determination of the legal questions then before the court"). More important, the court said nothing about the impossibility or impropriety of bringing a Lanham Act claim requiring contract interpretation. The court merely noted, after finding the false advertising claim insufficiently pleaded, that the plaintiff's only viable claim was for breach of contract, a claim over which the court lacked jurisdiction absent some federal hook. Defendants here ask the court to disclaim jurisdiction before even reaching the

sufficiency of plaintiffs' false advertising claim, a course of action for which *Silverstar* provides no support.

The second case, *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484 (D.C. Cir. 1996), is only somewhat closer. There, the plaintiff brought a Lanham Act claim challenging the promotional representations of two taxi companies, licensed only in neighboring states, that they were legally authorized to use standard taxicabs to provide "Blue Car" corporate transportation services entirely within the District of Columbia. Blue Car services, which normally used unmarked luxury cars, offered "on-call, point-to-point transportation billed on a contract, rather than a tariff, basis." *Id.* at 485. The claim turned on the interpretation of a D.C. Taxicab Commission order prohibiting the operation of unlicensed taxi services within the District except when passengers were picked up or dropped off within the state of licensure. *Id.* The defendants argued that the order applied only to traditional taxi service, not the use of taxicabs for Blue Car service, and that therefore their representations of legality were not false; the order itself was ambiguous on that point. *Id.*

The court declined to resolve the parties' underlying interpretive dispute, deeming it squarely within the jurisdiction of the Taxicab Commission, which had offered no opinion on the matter. *Id.* at 488. In the court's view, the plaintiff was "simply using the Lanham Act to try to enforce its preferred interpretation of [the order] instead of adjudicating the issue before the Commission." *Id.* The court concluded:

> By entertaining [the plaintiff's] claim, we would be transforming the Lanham Act into a handy device to reach all sorts of local law questions. . . . [W]e cannot find a single case that purports to extend the Act to allow federal judges to interpret and *enforce* municipal regulations, thus affording plaintiffs remedies over and above those provided by local law.

*Id.* at 490.

I note, first, that "the First Circuit has neither cited nor adopted *Dial A Car*'s reasoning prohibiting a Lanham Act claim when a matter involves an issue covered by a municipal regulation not yet addressed by the regulatory body." *Boston Cab Dispatch, Inc. v.*

*Uber Techs., Inc.*, Civil Action No. 13-10769-NMG, 2014 WL 1338144, at *25 (D. Mass. Feb. 28, 2014), *report and recommendation adopted in part*, *rejected in part*, 2014 WL 1338148 (D. Mass. Mar. 27, 2014). In any event, this case does not raise the specter of jurisdictional gamesmanship that distressed the court in *Dial A Car*. Plaintiffs do not ask the court to interpret an order or regulation over which an extrajudicial body has primary interpretive and enforcement authority. On the contrary, they ask for interpretation of a contract—for better or worse, the court's bread and butter. That the contract is between nondiverse parties does not change this fact in any meaningful way; federal courts often must entertain breach of contract claims in their exercise of supplemental jurisdiction, and to interpret the contract in such a case is not to step on the toes of local courts.

Defendants cite no case, and I am aware of none, applying *Dial A Car*'s reasoning to dismiss a false advertising claim involving contract interpretation. Instead, courts have found claims that a defendant misrepresented the nature of his contractual relationship with the plaintiff cognizable under the Lanham Act despite the inherent need in such cases to interpret the contract at issue. *See Schlotzky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 20 F.3d 393, 398–400 (5th Cir. 2008) (finding viable § 43(a) claim where, despite nonexclusive contract, defendant represented business relationship with plaintiff as exclusive); *AT & T Corp. v. Synet, Inc.*, No 96 C 0110, 1997 WL 89228, at *11–12 (N.D. Ill. Feb. 13, 1997) (granting summary judgment to plaintiff on § 43(a) claim where, despite contract classifying defendant as independent contractor, defendant represented that parties were in legal partnership). I conclude that defendants are not entitled to dismissal on this ground.

**B. False or Misleading Representation of Fact**

Defendants argue that the representations made in the letters and directory not false or misleading because the labs were, in fact, terminated as preferred providers for the Medicare Advantage Network. While this argument may have some merit, it is not sufficiently developed to support dismissal at this stage.

The crux of defendants' position is that the labs were terminated, at least in a de facto sense, even if, as plaintiffs claim, their termination was in breach of contract and legally ineffective. *See* Mot. 8 n.10 ("Plaintiffs were terminated. Whether that termination was proper, lawful, valid or invalid is what is in dispute."); *id.* at 19 ("Plaintiffs' Medicare Advantage relationships . . . were terminated. Precisely, that's why Plaintiffs filed the instant case claiming, among others [sic], breach of contract. . . . [T]he fact remains that . . . Plaintiffs do not form part of the [network]."). This reasoning holds some commonsense appeal; certainly it appears that the labs were removed from the network as a practical matter. But the nature or existence of a contractual relationship must be determined according to law, not common sense—and though one hopes the two will usually be in accord, things are not always so easy.

Defendants make no attempt to ground their argument in either the terms of the operative contracts or caselaw.[4] They provide no authority for the proposition that, under Puerto Rico law, a contractual relationship may be partially terminated as a factual matter by a third party or through inadequate notice. This failure is fatal to the contention that the representations at issue were literally true. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Defendants also assert that, to the extent their representations are alleged to be merely

[4] There is one exception, relating to plaintiffs' allegation that the labs' two-pronged contracts with MCS did not provide for partial termination—that is, removing the labs from the Medicare Advantage Network but not the PPO Network. Citing *Loiza Sugar Co. v. Hernaiz,* 35 D.P.R. 518 (P.R. 1926), and an inapposite case involving Texas law, defendants counter that contracts allowing "performance to be divided in two sets of partial performances" may be partially terminated even without a partial termination clause. Reply 4. First, defendants do not explain what it means for a contract to allow partial performance; nor do they point to any allegation or provision demonstrating that the contracts at issue were divisible. Second, even assuming that partial termination was permitted, defendants fail to address the other facts which, according to plaintiffs, rendered the termination ineffective. Perhaps the labs could be removed from the Medicare Advantage Network alone, but it does not follow that a third party could do the removing or that the removal required less than the specified notice.

misleading—as opposed to literally false—plaintiffs have failed to state a valid claim. A plaintiff may satisfy the first element of a false advertising claim "by proving either that an advertisement is false on its face or that the advertisement is literally true or ambiguous but likely to mislead and confuse consumers." *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 33 (1st Cir. 2000). As defendants correctly note, a plaintiff taking the latter path carries a greater burden. While a literally false representation is presumed to be deceptive, it must be affirmatively shown that a literally true advertisement "nonetheless conveys a misleading message to the viewing public." *Id.* The plaintiff must prove, "most often . . . by consumer survey data," that "a substantial portion of the audience for that advertisement was actually misled." *Id.* at 36.

No survey data or other extrinsic evidence is attached to or referenced in the complaint; in defendants' view, this omission is fatal. It is not. First, plaintiffs do not claim that defendants' representations were misleading; their claim is one of literal falsity. Second, defendants conflate the standard of proof with the standard for pleading. While it is true that the plaintiff in *Clorox* appended a consumer survey to its complaint, on which the court relied in vacating the dismissal below for failure to state a claim, *see id.* at 36–37, that case does not stand for the novel proposition that a Lanham Act plaintiff must buttress his allegations with hard evidence to make it past the pleading stage. *See Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 470 (E.D.N.Y. 2009) ("Defendants argue that plaintiffs can only establish their claim of false advertising through a survey, and state that unspecific reports of consumers experiencing confusion are not sufficient. Defendants misconstrue the standard. At this stage plaintiffs need only state that there was confusion and offer facts to support that claim."); *cf. Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013) (noting that the prima facie case for a political discrimination claim "is an evidentiary standard, not a pleading standard, and there is no need to set forth a detailed evidentiary proffer in a complaint").

### C. Commercial Advertising or Promotion

The Lanham Act's proscription of false advertising is limited, appropriately enough, to misrepresentations in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). Though the statute "covers more than classic advertising campaigns, it is nonetheless aimed at specific forms of communication." *Podiatrist Ass'n v. La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 19 (1st Cir. 2003). In *Podiatrist Ass'n*, the First Circuit adopted a four-part test, first articulated in *Gordon & Breach Science Publishers v. American Institute of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994), for determining whether a representation is "commercial advertising or promotion" within the meaning of § 43(a). Under that test,

> a representation must (a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the consuming public in such a way as to constitute "advertising" or "promotion."

*Podiatrist Ass'n*, 332 F.3d at 19 (citing *Gordon & Breach*, 859 F. Supp. at 1536); *accord Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1191 (9th Cir. 2003); *Proctor & Gamble Co. v. Haugen*, 222 F.3d 122, 1273–74 (10th Cir. 2000); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996); *see also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56–58 (2d Cir. 2002) (adopting *Gordon & Breach* test in large part but reserving judgment whether speaker must be in competition with plaintiff).

Defendants argue that none of the test's four prongs are satisfied here. Though they overreach on some points, I ultimately agree: the complaint fails to plausibly state that the challenged communications—the letters and the directory—constituted "commercial advertising or promotion." I consider each prong in turn, though slightly out of order.

#### 1. Commercial Speech

This first element refers to the commercial speech doctrine developed by the Supreme Court in its First Amendment jurisprudence. *Haugen*, 222 F.3d at 1274; *see Gordon & Breach*, 859 F. Supp. at 1536 ("Congress intended Section 43(a) to extend only to false

and misleading speech that is encompassed within the 'commercial speech' doctrine developed by the United States Supreme Court."). The Court has distinguished between purely commercial speech, "which occurs in an area traditionally subject to governmental regulation, and other varieties of speech." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). The distinction matters because commercial speech, though not wholly outside the First Amendment's reach, is "entitled to lesser protection than other constitutionally guaranteed expression." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993); *Ohralik*, 436 U.S. at 456 ("[W]e . . . have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.").

Defendants urge that the communications challenged here are not commercial speech because they did not propose a commercial transaction. Though defendants cite to no authority, they apparently refer to the Supreme Court's sometime definition of "commercial speech" as "speech which does 'no more than propose a commercial transaction.'" *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385 (1973)). But the Court has also described the category more broadly as "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980). This is the definition applied in this circuit. *See Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 13 (1st Cir. 2013) (stating *Central Hudson* formulation as *the* definition of commercial speech); *IMS Health Inc. v. Ayotte*, 550 F.3d 42, 54–55 (1st Cir. 2008) (rejecting narrower transaction-proposal definition), *abrogated on other grounds by Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011).

The letters and directory related to nothing more than the economic interests of Advantage and the relevant audiences. The letters served to notify patients already in a contractual relationship with Advantage that certain labs were no longer part of the network

and to suggest that the patients find a covered replacement. The directory was apparently simply a list, published for the benefit of current or potential insureds, of covered providers. Neither communication contained anything but straightforward information about the contours of a commercial relationship. Neither involved "speech on matters of public concern," which stands "at the heart of the First Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). Instead, the challenged speech was "solely in the individual interest of the speaker and its specific business audience." *Id.* at 762.

On this point, the First Circuit's analysis in *Pharmaceutical Care Management Ass'n v. Rowe*, 429 F.3d 294 (1st Cir. 2005), is instructive. There the court considered a state law requiring that pharmacy benefit managers ("PBMs") disclose certain information, including financial relationships with third parties, to their clients, health benefit providers. *Id.* at 298–99. One issue was whether the speech compelled by the law—the mandated disclosures—was commercial or noncommercial. The court concluded it was commercial, reasoning that the law was "overtly geared at the economic interests of the PBMs and the covered entities." *Id.* at 309. Even the portions of the law not facially related to those "economic interests," such as a provision requiring the disclosure of conflicts of interest, had a purely economic purpose: they were "aimed at eliminating certain PBM practices that unnecessarily increase[d] the cost of prescription medications." *Id.* at 309–10.

The situation here is similar. Medicare Advantage organizations are required to notify affected enrollees of a contracted provider's termination, 42 C.F.R. § 422.111(e), and to maintain an online list of covered providers, *id.* §§ 422.111(b)(3)(i), (h)(2)(i). These regulations are, like the law at issue in *Rowe*, plainly intended to better the marketplace by ensuring those contracting with the regulated entities are fully informed. It follows that the letters and directory, sent and updated, respectively, in order to comply with federal law, were commercial speech. The complaint is therefore sufficient as to this element of the *Gordon & Breach* test.

**2. Speaker in Competition with Plaintiff**

Defendants argue they are not in commercial competition with plaintiffs. Even assuming that is so, it does not entitle them to dismissal. As plaintiffs correctly argue, the *Gordon & Breach* test's competition requirement is no longer viable after the Supreme Court's recent decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).

At issue in *Lexmark* was what class of plaintiffs Congress authorized to sue for false advertising under the Lanham Act, a question framed by the parties in terms of standing. A plaintiff, the Court held, "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391. In reaching this conclusion, the Court rejected three alternative approaches, including a bright-line rule that would "permit[] only direct competitors to sue for false advertising." *Id.* The Court explained that, while "a plaintiff who does not compete with defendant will often have a harder time establishing" that it suffered a commercial injury proximately caused by the defendant's false advertising, "a rule categorically prohibiting all suits by noncompetitors would read too much into the Act's reference to 'unfair competition.'" *Id.* at 1392 (citing 15 U.S.C. § 1127 (stating general intent to protect against "unfair competition")). It would be a mistake "to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect *only* the false-advertiser's direct competitors." *Id.*

Though the Court expressly declined to address the scope of "commercial advertising or promotion," instead simply assuming the representations at issue qualified, *id.* at 1385 n.1, the effect of *Lexmark*'s holding on the current inquiry is inescapable. If noncompetitors may sue under § 43(a) for false advertising, it cannot be that only a competitor's speech may form the basis for such an action. *See Syngenta Seeds, Inc. v. Bunge N. Am., Inc.*, 773 F.3d 58, 64 (8th Cir. 2014) ("The Supreme Court . . . expressly rejected the requirement that challenged commercial speech be made by a competitor.").

Defendants' attempts to wriggle free of *Lexmark*'s logical consequences are ineffective. They cite to *Presby Environmental*, *Inc. v. Advanced Drainage System, Inc.*, Civil No. 13-cv-355-LM, 2014 WL 4955666 (D.N.H. Sept. 30, 2014), for the proposition that even in *Lexmark*'s wake the *Gordon & Breach* test, as adopted by the First Circuit, applies in full. It is true that *Presby Environmental*, decided after *Lexmark*, laid out the test's four prongs without comment. *See id.* at *8. But the parties' competitive status was clear—both manufactured septic equipment—and the court did not discuss the competition element at all. *See id.* at *1, *8–9.

Defendants next claim that, though *Lexmark* established that *direct* competition is not required, it remains necessary under the Act that the parties be at least *indirect* competitors. This proffered distinction is both unsupported and unworkable. Defendants cite only to a pre-*Lexmark* case stating, consistent with pre-*Lexmark* conceptions of standing, that § 43(a) is intended "to protect commercial interests that have been harmed by a competitor's false advertising." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1348 (11th Cir. 2012) (quoting *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008)).

To the extent defendants key onto *Lexmark*'s own references to "direct" competition, *see* 134 S. Ct. at 1391 (describing proposed test limiting Act's application to "direct competitors"); *id.* at 1392 ("It is thus a mistake to infer that . . . the Lanham Act . . . can protect *only* the false-advertiser's direct competitors."), I note that the Court also spoke of competition without any qualification. It discussed a hypothetical plaintiff "who does not *compete* with the defendant," described the rule it rejected as one "categorically prohibiting all suits by *noncompetitors*," and observed that when the Lanham act was passed, "the common-law tort of unfair competition was understood not to be limited to actions between *competitors*." *Id.* (emphases added). *Lexmark* does not explicitly preserve a requirement of competition of any sort.

Nor, more importantly, it is clear what defendants mean by "indirect competition."

There is only so much money in the world to go around; *all* commercial enterprises are competitors in the broadest sense. Defendants offer no reasoned basis on which to distinguish between indirect competitors and noncompetitors, and I decline to impose on plaintiffs such an illusory pleading requirement.[5]

**3. Intent of Soliciting Business from Potential Customers**

Here is where the flaws in plaintiffs' claim emerge. Defendants argue that it is not plausible to infer from the facts alleged that they were seeking to drum up business by telling patients the labs were no longer part of the Medicare Advantage Network or by publishing a directory representing the same. I agree. According to the complaint, the letters were sent only to patients already enrolled in an Advantage plan; plainly, letters to existing customers cannot reasonably be viewed as solicitations of "potential customers," as this element of the *Gordon & Breach* test requires. *Podiatrist Ass'n*, 332 F.3d at 19; *see Chamilia, LLC v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *9 (S.D.N.Y. Sept. 24, 2007) ("[L]etters sent by Pandora to its retailers do not constitute advertising or promotion. The statements therein were made to existing Pandora retailers . . . . Because [the letters] are designed to structure nascent or existing business relationships, but are in any case not a solicitation of new business, they do not meet the prong of the [*Gordon & Breach*] test requiring 'commercial advertising or promotion' to be made 'for the purpose of influencing consumers to buy defendant's goods or services.'").

Plaintiffs offer only meager resistance on this point. They emphasize that the letters were promotional in that they essentially instructed the recipient patients to patronize a new, covered clinical laboratory. But even assuming this can properly be viewed as indicative of

[5] It is possible that by "indirect" competitor defendants simply mean a plaintiff who, though not a "direct" competitor, has standing under *Lexmark*—that is, one who alleges commercial injury proximately caused by the defendant's misrepresentations. *See* 134 S. Ct. at 1391. Such a definition would be more or less in line with the Supreme Court's post-*Lexmark* use of the term "competitor" to "indicate all those within the class of persons and entities protected by the Lanham Act." *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2234 (2014). But the labs clearly have *Lexmark* standing. They allege a commercial injury—loss of patients—resulting directly from defendants' allegedly false statements.

an intent to promote these (unspecified) in-network providers, the point is moot. The test is whether the representation was intended to induce "potential customers to purchase *the speaker's* goods or services." *Podiatrist Ass'n*, 332 F.3d at 19 (emphasis added). Even drawing all inferences in plaintiffs' favor, it is not plausible that with the patient letters defendants intended to gain new customers for their own goods and services.

It is also not plausible that this was the intention behind the representations made in the directory. While, unlike the letters, the directory was surely meant to reach potential customers, not merely existing ones, it strains credulity to suppose that defendants aimed to entice those potential customers by declining to list the labs as covered providers. The directory as a whole might have served such a purpose; plaintiffs characterize it as a marketing tool. But, as defendants cogently argue, there is no world in which a customer would be more likely to enroll in defendants' plan because certain clinical laboratories were *not* part of its network. And that is the question; under the *Gordon & Breach* test, it is the "*representation*," not its medium, that "must . . . be made with the intent of influencing potential customers to purchase the speaker's goods or services." *Id.* at 19 (emphasis added). For a potential enrollee, the more available providers, the better; as a matter of common sense, defendants could not have hoped to receive more business by leaving the labs out of the directory. *See Iqbal*, 556 U.S. at 679 (noting that evaluating a claim's plausibility under Rule 12(b)(6) "requires the reviewing court to draw on its judicial experience and common sense").

Because plaintiffs have not adequately alleged that defendants made false or misleading representations intended to influence potential customers to purchase defendants' goods or services, their false advertising claims fail and should be dismissed with prejudice.

**4. Dissemination to Consuming Public**

Finally, defendants argue that their representations were not sufficiently disseminated to the public to constitute advertising or promotion. They do not explain how this is true of the directory representations, which were available online to, essentially, everyone. As to the

letters, however, I agree; this factor largely overlaps with the last. While it is true that, as plaintiffs say, ”the required level of circulation . . . will vary according to the specifics of the industry,” *Seven-Up*, 86 F.3d at 1385, it is not necessarily the problem here that the letters were sent only to specific recipients, rather than to the public at large. *See id.* at 1386 (“Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the [Lanham] Act.”). The problem, again, is that the patients reached with the letters were not part of the *consuming* public. *See Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co.*, No. CIV. A. 95-3997 (E.D. Pa. Nov. 14, 1995) (“The letters were not disseminated generally to the insurance buying public.”). This factor therefore provides an independent basis for dismissing plaintiffs' false advertising claim based on the patient letters.

## III. Supplemental Claims

After dismissing all claims conferring original jurisdiction, the court may in its discretion decline to exercise supplemental jurisdiction over pendant state-law claims. *See* 28 U.S.C. § 1367(c); *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 49 (1st Cir. 2011). While the pretrial dismissal of federal-question claims will generally point toward dismissing supplemental claims without prejudice, *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988), the court must take into account “concerns of comity, judicial economy, convenience, and fairness” before eschewing supplemental jurisdiction, *Izquierdo*, 662 F.3d at 49, weighing these factors in a “pragmatic and case-specific way,” *id.* (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1996)).

Here, as defendants urge, it is appropriate to dismiss plaintiffs' state-law claims. This case is yet in its early stages, and the bulk of the parties' work has been focused on plaintiffs' Lanham Act claims. Plaintiffs would not be unduly prejudiced by a move to the Puerto Rico courts. I therefore recommend that plaintiffs' claims for breach of contract and tortious

interference with contract be dismissed without prejudice.[6]

## CONCLUSION

For the above reasons, the motion to dismiss the should be **GRANTED**. Plaintiffs' Lanham Act claims should be **DISMISSED WITH PREJUDICE**, and their state-law claims **DISMISSED WITHOUT PREJUDICE**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 24th day of July, 2015.

S/ Bruce J. McGiverin

BRUCE J. MCGIVERIN
United States Magistrate Judge

---

[6] Before defendants moved for dismissal, plaintiffs moved for a preliminary injunction. Docket No. 14. That motion, too, was referred to me for a report and recommendation. Docket No. 20. Should the court decline to adopt the recommendation made here that the complaint be dismissed, mooting the preliminary injunction motion, I will prepare a supplemental report and recommendation on the propriety of preliminary injunctive relief.